IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| CHRISTOPHER BAILEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 3:21-CV-13-MAB |
| | ) | |
| CECIL THOMAS HOLT, | ) | |
| DANIEL SULLIVAN, TONY BUTLER, | ) | |
| SHANE TASKY, DAVID HERMETZ, | ) | |
| KIMBERLY WHARTON, | ) | |
| MICHAEL HARRIS, and | ) | |
| WARDEN OF BIG MUDDY RIVER | ) | |
| CORRECTIONAL CENTER, | ) | |
| | ) | |
| Defendants. | ) | |

<u>MEMORANDUM AND ORDER</u>

**BEATTY, Magistrate Judge:**

This matter is currently before the Court on Defendants' motion for summary judgment on all counts (Doc. 67). For the reasons explained below, the motion is granted in part and denied in part.

<u>BACKGROUND</u>

Plaintiff Christopher Bailey, who is civilly committed at Big Muddy Correctional Center as a sexually dangerous person ("SDP") under the Illinois Sexually Dangerous Persons Act, 725 ILL. COMP. STAT. 205/1.01, brought this action in January 2021 for alleged deprivations of his constitutional rights pursuant to 42 U.S.C. § 1983 (Doc. 1).[1] Plaintiff

---

[1] The Sexually Dangerous Persons Act authorizes the state's Director of Corrections to involuntarily commit and indefinitely detain individuals who have been charged with a crime and found to "suffer[ ] from a mental disorder . . . coupled with criminal propensities to the commission of sex offenses" and

claims, in short, that he was wrongfully issued a disciplinary ticket and punished with segregation for refusing to participate in the SDP treatment program. While in segregation, he was assaulted by a correctional officer, which led to another false disciplinary ticket and more punitive segregation time. Following a preliminary review of the complaint pursuant to 28 U.S.C. § 1915A, Plaintiff was permitted to proceed on the following six claims:

> **Count 1:** Fourteenth Amendment claim against Dr. Cecil Holt, the SDP Program Director at Big Muddy, for violating Plaintiff's right to refuse treatment.

> **Count 2:** First Amendment claim against Dr. Holt for issuing Plaintiff a disciplinary ticket and placing him in segregation in retaliation for refusing treatment.

> **Count 3:** Fourteenth Amendment claim for depriving Plaintiff of a protected liberty interest without due process in connection with a disciplinary ticket issued on January 10, 2019, against Dr. Holt, who wrote the ticket, Officers Tony Butler and Shane Tasky, who served on Big Muddy's Adjustment Committee and found Plaintiff guilty, and Warden Daniel Sullivan, who approved the recommended disciplinary action.

> **Count 4:** Fourteenth Amendment claim for depriving Plaintiff of a protected liberty interest without due process in connection with a second disciplinary ticket issued on March 2, 2019 against Sergeant Michael Harris, who wrote the ticket, Officers Tony Butler and David Hermetz, who served on the Adjustment Committee and found Plaintiff guilty, and Warden Daniel Sullivan, who approved the recommended disciplinary action.

> **Count 5:** Fourteenth Amendment claim against Lieutenant Kimberly Wharton for the use of excessive force.

---

"propensities toward acts of sexual assaults or acts of sexual molestation of children." 720 ILL. COMP. STAT. 205/1.01, /3, /3.01, /8; *Howe v. Hughes*, 74 F.4th 849, 853 (7th Cir. 2023). The Act requires the Director of Corrections to "provide care and treatment for the person committed to him designed to effect recovery." *Id.* at 205/8.

**Count 6:** Fourteenth Amendment claim against Sergeant Michael Harris for failing to intervene and protect Plaintiff from assault by Wharton.

The parties attempted to mediate a settlement in February 2023 but were unsuccessful (Docs. 49, 54). Defendants filed their motion for summary judgment on the merits of Plaintiff's claims on August 25, 2023 (Doc. 67). After requesting and receiving several extensions of time, Plaintiff filed his response in opposition on December 28, 2023 (Doc. 75). Defendants did not file a reply brief despite their initial indication that they would do so (*see* Doc. 76).

<u>FACTS</u>

SDPs at Big Muddy are subject to "Program Rules" as well as "Institutional Rules" (*see* Doc. 67-4, pp. 1, 13). One of the rules SDPs are subject to is a dress code (*Id.* at p. 4). The dress code requires SDPs to wear a blue shirt and blue pants, with the shirt tucked in, Monday through Friday from 8:00 a.m. to 2:30 p.m. (with the exception of holidays) (*Id.*). An SDP is given a verbal warning/counseling for their first violation of the dress code (*Id.* at p. 15). For subsequent violations, they can receive a program ticket, intensive therapy, or an institutional ticket, "depending upon additional behaviors at the time of the infraction, response of the individuals involved when informed of the infraction, [and] progressive nature of the offense" (*Id.* at p. 15; *see also id.* at pp. 13–14).

On January 10, 2019, Defendant Dr. Cecil Holt issued a Disciplinary Report—meaning an institutional ticket—to Plaintiff (Doc. 67-1, p. 6). The ticket states that Dr. Holt met with Plaintiff "to discuss his assertion that he 'will not follow the Policy and Procedures of the SDP Program or recognize [Holt's] authority as the Administrator of

the SDP Program.'" (*Id.*). Dr. Holt "explained the expectation that the Policy and Procedure[s] of the Program be followed and gave [Plaintiff] a minimum of five (5) direct orders to wear his blue shirt (tucked-in) while in the Day-Room during treatment hours . . ." (*Id.*). Plaintiff "loudly, angrily replied, "There ain't no way. I am not going to do it—ever. Your rules don't apply to me and you know it." (*Id.*). Plaintiff returned to B-wing, went upstairs, and took off his shirt in clear view of staff (*Id.*). Plaintiff "was then observed loudly informing and encouraging the large crowd of SDPs waiting for chow that SDPs who refuse to attend group are not under the Policy and Procedures of the SDP Program and do not have to follow them" (*Id.*). Plaintiff's offenses were listed as 205—Dangerous Disturbance, 208—Dangerous Communication, 215—Disobeying a Direct Order Essential to Safety and Security, 313—Disobeying a Direct Order, and 404—Violation of SDP Program Rules (*Id.*).

Defendants Shane Tasky and Tony Butler held an Adjustment Committee hearing on Plaintiff's disciplinary ticket on January 15, 2019 (Doc. 67-1, pp. 4–5). Plaintiff pled guilty to the 313 charge of Disobeying a Direct Order (*Id.*). He argued that he has the right to refuse treatment and that "nothing that ticket shows or states that it was dangerous communications or a threat to safety" (*Id.*). The hearing committee found Plaintiff not guilty of the first two charges, but guilty of the third, fourth, and fifth charges of 215—Disobeying a Direct Order Essential to Safety and Security, 313—Disobeying a Direct Order, and 404—Violation of SDP Program Rules (*Id.*). Defendants Tasky and Butler recommended three months of C-grade designation and three months of segregation (*Id.*). Warden Daniel Sullivan approved the recommended discipline (*Id.*).

On the evening of March 2, 2019, while Plaintiff was in segregation, Officer Berkeley (who is not a defendant) came to get Plaintiff's cellmate for the evening medication line (Doc. 67-3, pp. 78–79). Officer Berkeley told Plaintiff to get out of bed and come to the door to cuff up so his cellmate could be taken out (*Id.* at p. 79). Plaintiff explained at his deposition that, previously, an officer would just have him sit on the bed or go to the back of the cell but then the policy changed and officers made him cuff up (*Id.* at pp. 79–80). Plaintiff further explained that he would be left in the cuffs for five to ten minutes while his cellmate was at medline, and the cuffs were only removed after his cellmate got back (*Id.* p. 80). Plaintiff thought the whole process was unnecessary, so he refused to cuff up when Berkeley asked (*Id.* at pp. 80–81). Hearing the disagreement between Berkeley and Plaintiff, Defendants Kimberly Wharton, a lieutenant, and Michael Harris, a sergeant, came to the cell to assist (*Id.* at pp. 79, 81). Defendant Wharton ordered Plaintiff to come to the door and cuff up, and he did so (*Id.* at pp. 81, 82).

As Plaintiff tells it, after his cellmate and Officer Berkeley left to visit the medical line, Plaintiff initiated a verbal altercation with Defendant Wharton, complaining about the necessity of being cuffed during cellmate extractions and saying "something about her attitude is not necessary," because he thought she was being "unnecessarily . . . hostile in her tone, her attitude, her behavior, [and] her body language" (Doc. 67-3, pp. 83–84, 86). Plaintiff said Defendant Wharton slammed the cell door shut and turned to walk away (*Id.* at p. 87). But she had slammed the door so hard that it did not latch and bounced back open (*Id.* at p. 87). Wharton turned back toward the cell and grabbed the door again (*Id.*). Plaintiff admitted that he was not at the back of the cell; he said in a grievance that

he had stepped toward the door when Wharton shut the door the first time, (Doc. 75, p. 45), and he testified at his deposition that he was in the middle of the cell (Doc. 67-3, p. 87). Wharton ordered Plaintiff to sit down (*Id.* at pp. 84, 86, 87; Doc. 75, p. 45). Plaintiff said that he "began to step backwards towards the bunk while stating 'that attitude isn't necessary'" (Doc. 75, p. 45). Wharton then charged into the cell and shoved him with an open hand against his chest and yelled at him again to sit down (*Id.*). Plaintiff told Wharton "not to put her hands on [him]" (*Id.*). Wharton shoved him two or three more times, yelling at him to sit down, all the while Plaintiff talked back (*Id.*; Doc. 67-3, pp. 84, 86, 89). The last shove forced Plaintiff's back up against the side of the bedframe (Doc. 75, p. 45; Doc. 67-3, pp. 87, 90). At that point, Plaintiff stuck his leg up and kicked Wharton in her lower abdomen and/or groin area (Doc. 67-3, pp. 85, 90, 91).

Plaintiff said he did not kick Wharton "with the intent of actually harming her or even necessarily hitting her . . . [but] only to interrupt what she was doing, which was repeatedly [shoving him]." (*Id.* at pp. 85–86). Once Plaintiff kicked Wharton, Defendant Harris, who was positioned behind Wharton, sprung between Plaintiff and Wharton to stop the altercation (*Id.* at p. 89). Plaintiff admits that he suffered no injuries as a result of being shoved by Defendant Wharton (*Id.* at pp. 87–88).

Defendant Harris issued a disciplinary report to Plaintiff describing the incident and charging Plaintiff with two Violations: (1) Assault with Injury, and (2) Disobeying a Direct Order Essential to Safety and Security (Doc. 67-1, p. 3). According to the ticket, Plaintiff "kick[ed] Lt. Wharton in the stomach and groin area stating, 'fuck you bitch, I know my rights' after refusing several direct orders from Lt. Wharton to move back from

the opened cell door and sit down while . . . his cell mate [was being removed] for medline." (*Id.*). Defendants Tony Butler and David Hermetz held an Adjustment Committee hearing on the ticket on March 5, 2019 (*Id.* at pp. 1–2). Plaintiff pled not guilty and objected to Defendant Butler's presence on the Hearing Committee stating, "we have a history." (*Id.*; *see also* Doc. 67-3, pp. 95–96; Doc. 75, pp. 50–51). According to the report, the Committee determined there was no basis for Plaintiff's objection to Defendant Butler, and Plaintiff "then refused to take part in the hearing" (*Id.*). Plaintiff was found guilty of both violations (*Id.*). The Committee recommended one year C-grade, one year segregation, six months contact visits restriction, and one year segregation yard restriction (*Id.*). Warden Sullivan approved the recommended disciplinary action on March 7, 2019 (*Id.*).

Plaintiff disputes the narrative in the Adjustment Committee's report as to what occurred at the hearing (Doc. 75, p. 2 #20, p. 11). Plaintiff testified that he raised an objection to Defendant Butler's involvement at the beginning of the hearing, and Butler said he could not object (Doc. 67-3, pp. 95–96; Doc. 75, pp. 50–51). Plaintiff argued that he did have the right to object to a committee member presiding over the hearing, and he and Butler "had a back-and-forth" on the issue (Doc. 67-3, p. 96; Doc. 75, pp. 50–51). Plaintiff recounted in a grievance that the dispute reached a point where Butler said, "You think you fucking know everything don't you?" (Doc. 75, p. 51). Butler then stood up and "got in [Plaintiff's] face like nose to nose," and something to the effect of "Why don't you try kicking me like you kicked her. I'll beat your fucking ass" (Doc. 67-3, pp. 96–97; *see also* Doc. 75, p. 51). Plaintiff retorted something along the lines of, "If you give me a reason

for me to defend myself, I will." (Doc. 67-3, p. 97; *see also* Doc. 75, p. 51). Plaintiff said he and Butler bickered a bit more until Butler ended it by telling Plaintiff that he would not be making a statement to the Committee and telling an officer to take Plaintiff back to his cell (*Id.* at p. 97; *see also* Doc. 75, p. 51).

L<span>EGAL</span> S<span>TANDARD</span>

Summary judgment is proper when the moving party "shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." F<span>ED</span>. R. C<span>IV</span>. P. 56(a). Under Rule 56, the movant has the initial burden of informing the court why a trial is not necessary. *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The burden then switches to the party opposing summary judgment to come forward with properly supported arguments or evidence that show the existence of a genuine issue of material fact. *Treadwell v. Office of Ill. Sec'y of State*, 455 F.3d 778, 781 (7th Cir. 2006). "Factual disputes are genuine only if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the evidence presented, and they are material only if their resolution might change the suit's outcome under the governing law." *Maniscalco v. Simon*, 712 F.3d 1139, 1143 (7th Cir. 2013) (citation and internal quotation marks omitted). In deciding a motion for summary judgment, the court's role is not to determine the truth of the matter, and the court does not "weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true." *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 760 (7th Cir. 2021). Instead, the court's task is to view the record and draw all reasonable

inferences in the light most favorable to the non-moving party and decide if there is a genuine material dispute of fact that requires a trial. *Stewart*, 14 F.4th at 760; *Hansen v. Fincantieri Marine Grp., LLC*, 763 F.3d 832, 836 (7th Cir. 2014).

DISCUSSION

### A.  COUNT 1 – RIGHT TO REFUSE TREATMENT

In Count 1, Plaintiff alleged that Dr. Holt violated his right to refuse treatment by ticketing him when he refused treatment and refused to be a part of the SDP treatment program (Doc. 7; *see also* Doc. 1, pp. 9, 14, 24). It is now clear at summary judgment that Plaintiff was actually ticketed for not following the dress code of the SDP program (amongst other things). Plaintiff essentially contends that the dress code *is* treatment, or at least a component of treatment, arguing that the dress code "exists solely as part of the [SDP] program," which "in and of itself is treatment" and "which [he] has the right to refuse to be a part of" (Doc. 75, pp. 4–5).

Plaintiff seems to think that his right to refuse treatment extends so far as to allow him to opt out of any involvement whatsoever with the SDP program, and therefore he does not have to follow any of the rules of the program. But his argument is an illogical game of semantics, twisting the meaning of the word "treatment" to fit his narrative. This argument is unavailing.

A dress code is generally not considered "treatment." Rather, it is one of many rules that normally govern confinement of any kind and are designed to ensure a safe, secure, and orderly-run institution. *See, e.g., Young v. Lane*, 922 F.2d 370, 375 (7th Cir. 1991) (noting that prisons have a strong security interest in uniform dress regulations). *See also*

*Cruzan v. Dir., Mo., Dep't of Health,* 497 U.S. 267, 278 (1990) ("[A] competent person has a constitutionally protected liberty interest in refusing unwanted *medical* treatment . . . .") (emphasis added). As Defendants said, Plaintiff maintains the right to refuse treatment and Dr. Holt respected that right by not forcing Plaintiff to participate in group sessions or assigning him any type of therapy-related work (Doc. 67, p. 9). The right to refuse treatment, however, does not release Plaintiff from his judicially mandated civil confinement or absolve him from following the rules implemented for civilly committed SDPs at Big Muddy. Plaintiff has not offered any convincing argument or supporting authority to the contrary (*see* Doc. 75). Simply put, so long as Plaintiff is confined in an IDOC facility, he must follow a dress code, and a failure to do so can lead to punishment by the institution. *See Allison v. Snyder*, 332 F.3d 1076, 1079 (7th Cir. 2003) (explaining that assigning civil committees to prisons and subjecting them to the usual institutional rules designed to assure safety and security does not amount to constitutionally impermissible punishment); *West v. Schwebke*, 333 F.3d 745, 748 (7th Cir. 2003) (civil detainees can be punished for violating institutional rules).

Accordingly, no reasonable jury could conclude that Dr. Holt violated Plaintiff's right to refuse treatment by ticketing him for failing follow the dress code, and Dr. Holt is entitled to summary judgment on Count 1.

**B.  COUNT 2 – RETALIATION FOR REFUSING TREATMENT**

To prevail on his First Amendment retaliation claim, a plaintiff must show that he engaged in activity protected by the First Amendment, the defendant took adverse action against him that would likely deter the protected activity in the future, and his protected

activity was at least a motivating factor in the defendant's decision to subject him to the adverse treatment. *Manuel v. Nalley*, 966 F.3d 678, 680 (7th Cir. 2020) (citing *Kidwell v. Eisenhauer*, 679 F.3d 957, 964 (7th Cir. 2012)). If the plaintiff makes this prima facie showing, the burden shifts to the defendant to demonstrate "that the activity would have occurred regardless of the protected activity." *Manuel*, 966 F.3d at 680 (citation omitted). The burden then shifts back to the plaintiff to demonstrate that the defendant's proffered reason is pretextual or dishonest. *Manuel*, 966 F.3d at 680 (citation omitted).

In Count 2, Plaintiff claims that Dr. Holt retaliated against him by ticketing him and subjecting him to segregation for refusing treatment and also informing other SDP detainees that they have a right to refuse treatment (Doc. 75, p. 5; *see also* Doc. 7, pp. 7–8; Doc. 1, p. 9). However, Plaintiff's allegations are not exactly borne out by the evidence on summary judgment. The disciplinary report indicates that Plaintiff was ticketed for refusing Dr. Holt's orders to follow the dress code, which Plaintiff erroneously refers to as "treatment," loudly stating that the SDP Program rules did not apply to him, and then going to the top of the stairs and taking off his shirt in a particularly dramatic display of defiance before "loudly informing and encouraging the large crowd of SDPs waiting for chow" to, in essence, not follow the Policy and Procedures of the SDP Program.

According to Plaintiff, his proclamation to his fellow SDPs was protected by the First Amendment (Doc. 75, p. 5). That is not so. While Plaintiff may have a First Amendment right to petition the prison for redress of his grievance regarding the applicability of the SDP rules, he does not have free reign to choose the manner of his protest. "If inmates have some First Amendment rights, . . . they only have those rights

that are consistent with prison discipline." *Hale v. Scott*, 371 F.3d 917, 919 (7th Cir. 2004) (quoting *Ustrak v. Fairman*, 781 F.2d 573, 580 (7th Cir. 1986)). *See also Freeman v. Texas Dep't of Crim. Just.*, 369 F.3d 854, 864 (5th Cir. 2004) (explaining that while an inmate "retain[s], in a general sense, a right to criticize prison officials," he must "exercise[e] that right in a manner consistent with his status as a prisoner.").

Plaintiff's pronouncement to the other SDPs was undoubtedly disruptive and served to undermine Dr. Holt's authority and ability to implement and enforce program rules. Publicly urging other SDPs to flout the rules and not respect authority is inconsistent with legitimate penological interests in discipline and order and therefore not protected speech. *Cf. Watkins v. Kasper*, 599 F.3d 791, 797 (7th Cir. 2010) (holding inmate law clerk's public criticism of librarian's policies was unprotected speech because it was disruptive and impeded librarian's authority); *Pilgrim v. Luther,* 571 F.3d 201, 205 (2d Cir.2009) (finding that a pamphlet urging inmates to engage in work stoppages was inconsistent with legitimate penological interests); *Freeman,* 369 F.3d at 864 (concluding that a public rebuke of a prison chaplain that incited some fifty prisoners to walk out of a church service was inconsistent with prison discipline).

Defendants also argue that Plaintiff was not punished for his pronouncement to the other SDPs—he was found not guilty of the 205 charge for Dangerous Disturbance and the 208 charge for Dangerous Communication—and that he would have been punished even if he had not made the pronouncement to the other SDPs because of the other rule infractions (Doc. 67, pp. 11–12). In response, Plaintiff contends that even though he was found not guilty of the offenses related to his statements to the other SDPs,

those charges still contributed to the punishment that he received (Doc. 75, p. 6). And he claims the ticket and segregation stint he received "were designed to silence [him]" (*Id.*). Plaintiff's contentions, however, are pure speculation, which is not enough to defeat summary judgment. *Devbrow v. Gallegos*, 735 F.3d 584, 588 (7th Cir. 2013) (citing *Springer v. Durflinger,* 518 F.3d 479, 484 (7th Cir. 2008) (speculation concerning retaliatory motives cannot create a genuine issue of material fact)). The evidence demonstrates that there was a legitimate reason independent of any retaliatory motive for issuing the ticket: Plaintiff committed other rule infractions by refusing to obey Dr. Holt's orders to follow the dress code and taking off his shirt, neither of which Plaintiff denies (*see* Doc. 75). In fact, Plaintiff acknowledged his adamancy that he was not to subject to the dress code and that he took off his blue shirt (Doc. 67-3, pp. 41–43). Under these circumstances, it is difficult to see how writing Plaintiff a ticket could be viewed as retaliatory, rather than the natural, logical consequence of Plaintiff refusing to follow the rules.

For these reasons, Plaintiff cannot establish the necessary elements of a First Amendment retaliation claim, and Dr. Holt is entitled to summary judgment.

## C.  COUNT 3 – DUE PROCESS RE: FIRST HEARING

In Count 3, Plaintiff alleged that the ticket Dr. Holt wrote in January 2019 was pretextual, that he was denied procedural due process in connection with the Adjustment Committee hearing in front of Defendants Butler and Tasky, and that Warden Sullivan nevertheless approved of the recommended punishment (Doc. 7, pp. 8, 2; Doc. 1, pp. 14, 24, 35).

Defendants concede that Plaintiff's punishment of three months in segregation

triggered his right to procedural due process safeguards (Doc. 67, pp. 12–13). The Court likewise operates on that assumption. *Cf. Higgs v. Carver*, 286 F.3d 437, 438 (7th Cir. 2002) ("A pretrial detainee cannot be placed in segregation as a punishment for a disciplinary infraction without notice and an opportunity to be heard; due process requires no less."); *Rapier v. Harris,* 172 F. 3d 999, 1005 (7th Cir. 1999) ("[I]t is permissible to punish a pretrial detainee for misconduct while in pretrial custody, [but] that punishment can be imposed only after affording the detainee some sort of procedural protection.").

The purported pretextual ticket does not in and of itself violate due process, and a prisoner does not have a viable constitutional claim so long as procedural due process protections were provided. *Bramlett v. Carich*, 590 Fed. Appx. 625, 627 (7th Cir. 2014) (citing *McPherson v. McBride,* 188 F.3d 784, 787 (7th Cir. 1999)); *Hadley v. Peters,* 70 F.3d 117 (7th Cir. 1995), *affirming* 841 F.Supp. 850, 856 (C.D. Ill. 1994). Those protections include: (1) advanced written notice of the disciplinary charges against him; (2) the right to appear before an impartial decisionmaker; (3) the right to call witnesses and present evidence, if prison safety allows; and (4) a written statement of the reasons for the discipline imposed. *Prude v. Meli*, 76 F.4th 648, 657 (7th Cir. 2023); *see also Wolff v. McDonnell,* 418 U.S. 539, 563-569 (1974). Additionally, "the disciplinary decision must be supported by at least 'some evidence.'" *Scruggs v. Jordan*, 485 F.3d 934, 941 (7th Cir. 2007) (citing *Superintendent, Mass. Corr. Inst., Walpole v. Hill,* 472 U.S. 445, 455 (1985)).

Plaintiff raises a number of due process challenges to the first disciplinary hearing. He claims that Defendant Butler was not an impartial decisionmaker, that he was not allowed to submit any evidence in his favor, and that the Adjustment Committee did not

provide an explanation for finding him guilty (Doc. 75, pp. 6, 7). Plaintiff also argues there is no basis for the 404 charge for violating the SDP program rules and that there is insufficient evidence to support finding him guilty of the 215 charge for disobeying a direct order essential to safety and security (*Id.* at pp. 7–9).

### 1. Impartial Decisionmaker

Due process entitles a prisoner to an impartial decisionmaker during a prison disciplinary hearing. *Prude*, 76 F.4th at 657. *See also Ramirez v. Turner,* 991 F.2d 351, 355 (7th Cir. 1993) ("There must be a 'neutral and detached' decision-making body.") (citation omitted). However, "[a]djudicators enjoy a presumption of honesty and integrity, and thus the constitutional standard for impermissible bias is high." *Prude*, 76 F.4th at 657 (citation omitted); *Piggie v. Cotton*, 342 F.3d 660, 666 (7th Cir. 2003) (citations omitted). "The presumption is a rebuttable one, but the burden of rebuttal is heavy . . . . [T]he party claiming bias must lay a specific foundation of prejudice or prejudgment, such that the probability of actual bias is too high to be constitutionally tolerable." *Hess v. Bd. of Trustees of S. Illinois Univ.*, 839 F.3d 668, 675 (7th Cir. 2016) (citing *Withrow v. Larkin*, 421 U.S. 35, 47, 55 (1975)). *See also Higgason v. Lemmon*, 6 Fed. Appx. 433, 435 (7th Cir. 2001) ("This presumption can be overcome with 'clear evidence to the contrary.'") (quoting *United States v. Armstrong*, 517 U.S. 456, 464 (1996)); *Head v. Chicago Sch. Reform Bd. of Trustees*, 225 F.3d 794, 804 (7th Cir. 2000) (to overcome presumption of adjudicator's good faith, honesty, and integrity, "a plaintiff must come forward with substantial evidence of actual or potential bias, such as evidence of a pecuniary interest in the proceeding, personal animosity toward the plaintiff, or actual prejudgment of the plaintiff's case.") (citing

*Withrow*, 421 U.S. at 47). Due process is offended only if the decisionmaker is so biased that it presents "a hazard of arbitrary decision making." *Wolff*, 418 U.S. at 571.

Plaintiff's argument regarding Defendant Butler's impartiality at the hearing for the January 2019 ticket is perfunctory and undeveloped (*see* Doc. 75, p. 6). All he says is that Defendant Butler "was not impartial and conducted himself in a manner that supports that claim" (*Id.*). Plaintiff also did not cite to evidence sufficient for a reasonable jury to side with him. He cited to "Doc. 1, Ex. 4, Ex. 4 – C, H, and K" (*Id.*). "Ex. 4" is a ten-page, unsworn "Petition of the Facts" (Doc. 75, pp. 20–29), and Plaintiff did not provide a pin cite (*see* Doc. 75, p. 6). The Court will not scour this entire document for references to Butler and then speculate as to whether those statements were the ones Plaintiff intended to support his argument. *See Grant v. Trustees of Indiana Univ.*, 870 F.3d 562, 572 (7th Cir. 2017) (courts are not required to "scour the record in search of evidence to defeat a motion for summary judgment.") (citation omitted). Document "C" is a grievance, in which Plaintiff wrote that Butler got "angry" when he objected to Butler's presence on the Adjustment Committee and sent Plaintiff back to his cell (Doc. 75, p. 33). Plaintiff said he was brought back later that day for a hearing "before Butler and Tasky despite my objections" (*Id.*). Plaintiff stated that he objected to Butler's involvement because "on multiple occasions in the past he has threatened me, both with physical violence and recently by stating that he would ensure that I got excessive discipline on tickets" (*Id.* at p. 34). Exhibit "H" is a grievance response that states "Officer Butler . . . denied offender's claims of previous threats" and that "the Committee took [Plaintiff's] objection under consideration and deemed there was no conflict of interest [so] the hearing continued."

(*Id.* at p. 35). And Exhibit "K" is a four-page letter to the Administrative Review Board, which contests the statements made in the grievance response but provides no further details about  Butler's supposed threats (*Id.* at pp. 36–39). Other evidence came from Plaintiff's deposition, where he testified, "I've had multiple issues with Butler both on and off the adjustment committee" (Doc. 67-3, p. 95). "A lot of inmates have had issues with him and his personality problems . . . ." (*Id.* at p. 96).

None of this amounts to clear and substantial evidence that Butler harbored some kind of personal animosity against Plaintiff to an extent that disqualified him from adjudicating the disciplinary ticket. Plaintiff provides only vague and unspecific statements that he had "issues" with Butler and that Butler had threatened him. He does not recount any specific factual instances of purported run-ins with Butler, when or where they occurred, how often they occurred, what Butler specifically said to him and why they may have occured. Such details are necessary for a reasonable jury to infer that Defendant Butler was not a neutral and impartial decisionmaker *See Shroyer v. Cotton*, 80 Fed. Appx. 481, 485 (7th Cir. 2003) ("[U]nsupported allegations of vindictiveness on the part of the [decisionmaker] do not overcome the presumption of honesty and integrity that [decisionmakers] are entitled to.").[2]

---

[2] *See also Smith v. City of Janesville*, 40 F.4th 816, 821 (7th Cir. 2022) ("If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.") (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986)); *Gabrielle M. v. Park Forest–Chicago Heights, IL. Sch. Dist. 163*, 315 F.3d 817, 822 (7th Cir. 2003) ("It is well established that in order to withstand summary judgment, the non-movant must allege *specific* facts creating a genuine issue for trial and may not rely on vague, conclusory allegations.") (emphasis in original; citations omitted); *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) ("Summary judgment is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events.") (citation omitted); *Michas v. Health Cost Controls of Illinois, Inc.*, 209 F.3d 687, 692 (7th Cir. 2000) ("[N]either 'the mere

## 2.  Witnesses and Evidence

Plaintiff contends that the Adjustment Committee did not allow him to submit any evidence (Doc. 75, p. 6), but Plaintiff did not identify what evidence he wanted to present (*see id.*). The portion of the record that he cited to only vaguely mentions "documents" (*see id.* at pp. 6, 38). Plaintiff did not indicate what the documents were, how they might have aided his defense (particularly given that he pled guilty to disobeying a direct order, thereby admitting he failed to follow the dress code), or why he thinks they would have changed the hearing officers' assessment. Absent something more specific, no reasonable jury could infer that Plaintiff's inability to present his "documents" harmed him in some way or amounts to a due process violation. *See Grossman v. Bruce*, 447 F.3d 801, 805 (10th Cir. 2006) ("[A] prisoner cannot maintain a due process claim for failure to permit witness testimony if he fails to show that the testimony 'would have affected the outcome of his case.'") (citation omitted); *Doan v. Buss*, 82 Fed. Appx. 168, 171 (7th Cir. 2003) (holding no due process violation where plaintiff failed to show how uncalled witnesses "would have affected the outcome"). *See also Scruggs,* 485 F.3d at 939–40 ("[P]rison disciplinary officials need not permit the presentation of irrelevant or repetitive evidence in order to afford prisoners due process in disciplinary proceedings. Nor are officials required to allow the

---

existence of *some* alleged factual dispute between the parties,' nor the existence of 'some metaphysical doubt as to the material facts,' will defeat a motion for summary judgment." (internal citations omitted); *Drake v. Minnesota Mining & Manufacturing Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter, rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.") (citation omitted).

presentation of evidence that could threaten institutional safety or correctional goals.")
(citations omitted).

### 3.   Explanation for Discipline & Sufficiency of the Evidence

"Due process requires that an inmate subject to disciplinary action is provided 'a written statement by the factfinders as to the evidence relied on and the reasons for the disciplinary actions.'" *Scruggs*, 485 F.3d at 941 (quoting *Forbes*, 976 F.2d at 318. This requirement, however, "is not onerous" and "[t]he statement need only illuminate the evidentiary basis and reasoning behind the decision." *Scruggs*, 485 F.3d at 941.

The evidentiary basis required for disciplinary decisions is "some evidence" that "bear[s] some indicia of reliability." *Scruggs*, 485 F.3d at 941 (calling "some evidence" standard a "meager threshold"). *See also Ellison v. Zatecky*, 820 F.3d 271, 274 (7th Cir. 2016) ( "[A] hearing officer's decision need only rest on 'some evidence' logically supporting it and demonstrating that the result is not arbitrary."); *Eichwedel v. Chandler*, 696 F.3d 660, 675 (7th Cir. 2012) ("The some evidence standard . . . is satisfied if there is any evidence in the record that could support the conclusion reached by the disciplinary board.") (citation and quotation marks omitted).

Plaintiff seems to contend that the written statement here does not pass muster because it parrots the narrative written by Dr. Holt on the ticket (Doc. 75, p. 7). But there is no categorical rule that exists in the Seventh Circuit prohibiting the Adjustment Committee from crediting and adopting the statement of the officer who wrote the ticket. Furthermore, Plaintiff's argument fails to acknowledge that he pled guilty to disobeying a direct order (*see id.*). The Adjustment Committee's report demonstrates that it relied on

Plaintiff's admission of guilt, as well as Dr. Holt's description of Plaintiff's conduct (*see* Doc. 67-1, p. 4). That is sufficient under the circumstances for the 313 charge for disobeying a direct order and the 404 charge for violating the SDP Program rules. *See Scruggs*, 485 F.3d at 941 (upholding sufficiency of written explanation where prison board relied on inmate's admission in finding him guilty); *Culbert v. Young,* 834 F.2d 624, 629 (7th Cir. 1987) (finding summary statement "refer[ing] to the conduct report as the basis for its guilt determination" sufficient when only issue was relative credibility of the conduct report and plaintiff's account of the incident. 'Obviously, . . . the committee believed the conduct report and disbelieved the plaintiff.'") (quoting *Saenz v. Young,* 811 F.2d 1172, 1173–74 (7th Cir. 1987)).

Plaintiff also argues there was no basis for charging him with the 404 offense for violating the SDP program rules, let alone finding him guilty and punishing him, because he was not participating in the program and therefore not subject to its rules (Doc. 75, p. 8). The Court has already rejected his argument. Plaintiff was civilly committed to the custody of the IDOC as a Sexually Dangerous Person. And as the Court previously explained, he did not cite to any legal authority that he could opt not to follow the rules governing the confinement of SDPs at Big Muddy. Nor does the Court find his argument on this subject convincing. Plaintiff has therefore failed to establish a genuine issue of material fact as to whether the 404 charge violated his right to procedural due process.

Plaintiff also challenges the basis for the 215 charge, conviction, and punishment for Disobeying a Direct Order Essential to Safety and Security (Doc. 75, p. 8). According to Plaintiff, the only direct order at issue here was Dr. Holt's order to follow the dress

code and wear his blue shirt, tucked in, during treatment hours (Doc. 75, p. 9; *see also* Doc. 67-1, p. 6). Plaintiff argues that not wearing a blue shirt in the dayroom "could not possibly threaten the safety and security of the facility in and of itself. It creates no threat of harm to oneself. . . [and] does not disrupt day-to-day facility operations" (Doc. 75, p. 9). The Court is not convinced by this argument, even in the absence of a reply brief from Defendants addressing the matter. A dress code serves to promote the legitimate institutional interests in safety, security, and order, and allowing one detainee to openly flout the dress code undermines those interests. *See, e.g., Young v. Lane*, 922 F.2d 370, 375 (7th Cir. 1991) (acknowledging prisons have a strong security interest in uniform dress regulations).

Plaintiff made another argument regarding the 215 charge, however, that the Court must address. He contends there is no evidence that his continued refusal to follow the dress code necessitated the use of force to gain his compliance, which is a necessary element of the 215 charge (Doc. 75, p. 9). Indeed, the regulations in effect at the time of Plaintiff's disciplinary conviction defined the offense of Disobeying a Direct Order Essential to Safety and Security as:

> Willfully refusing, or neglecting to comply with, an order *when continued refusal results in a use of force* to maintain the safety and security of a facility. This shall include, but not be limited to, refusing to submit to a search, refusing to submit to the application of mechanical restraints, refusing a designated housing assignment or refusing to leave an area.

ILL. ADMIN. CODE, tit. 20, part 504, App. A (effective Apr. 1, 2017) (emphasis added). As Plaintiff points out, of the three charges he was found guilty of, the 215 charge is the only

one that carried a possible punishment of segregation time (*Id.* at p. 9). Ill. Admin. Code,
tit. 20, part 504, Table A.

Plaintiff's argument is essentially a procedural due process argument that the
guilty finding on the 215 charge was not supported by some evidence because the facts
in Dr. Holt's disciplinary report did not, on their face, meet all of the elements of that
charge. At this stage, Plaintiff's argument is sufficient to stave off summary judgment.
There is no indication that Plaintiff's continued refusal to follow Dr. Holt's orders to
comply with the dress code resulted in the use of force to bring him into compliance.
There is no evidence that an officer even approached Plaintiff after he took his blue shirt
off, let alone that he was handcuffed or otherwise subdued in any manner. According to
Plaintiff, he put his shirt back on shortly after the incident and went to lunch (Doc. 67-3,
pp. 42–43). It was only after he returned from lunch that a lieutenant showed up at his
cell and walked him to segregation (*Id.* at p. 44). It is unclear if being taken to segregation
approximately an hour after the incident constitutes a use of force that could justify
upholding the 215 charge, or if there is any other explanation that justifies upholding it,
Defendants did not file a reply brief to address this issue. All the Court has is Plaintiff's
unchallenged argument that because there is no evidence to support a requisite element
of the 215 offense, there is insufficient evidence to support the adverse finding of guilt
and imposition of segregation as a punishment. Consequently, the Court cannot say as a
matter of law that Plaintiff's procedural due process rights were not violated by being
charged with, found guilty of, and punished for the 215 offense. *See Morgan v. Dretke*, 433
F.3d 455, 458 (5th Cir. 2005) (agreeing with prisoner that due process was violated when

there was no evidence in the record to support an element of disciplinary offense prisoner was convicted of). Defendants Dr. Holt, Officer Butler, Officer Trasky, and Warden Sullivan are therefore not entitled to summary judgment on Count 3.

## D. COUNT 4 – DUE PROCESS RE: SECOND HEARING

Similar to Count 3, Plaintiff alleges in Count 4 that Sgt. Harris wrote him a false disciplinary ticket in March 2019, he was denied procedural due process in connection with the Adjustment Committee hearing in front of Defendants Butler and Hermetz, and Warden Sullivan improperly approved the recommended punishment (Doc. 7, pp. 2–3; 8–9; *see also* Doc. 1, pp. 16, 26, 64, 65; Doc. 1-1, p. 7).

Plaintiff makes no argument as to how the ticket was purportedly fraudulent or pretextual (*see* Doc. 75, pp. 10–12). But he once again raises a number of arguments regarding the purportedly insufficient process he received in connection with the hearing (*Id.*), none of which the Court finds convincing.

### 1. Impartial Decisionmaker

Plaintiff argues that Defendant Butler was not an impartial decision maker (Doc. 75, pp. 10–11). To the extent Plaintiff is relying on his assertions of previous issues with Butler, the Court has already determined that Plaintiff's evidence is far too vague and unspecific to establish a genuine issue of material fact. Plaintiff also suggested at his deposition that Butler's lack of impartiality might be due to "the fact that I had been in a physical altercation with a fellow officer, also a fellow officer who is a woman . . . ." (*Id.* at p. 96). It is well-established, however, that Officer Butler and Lt. Wharton's status as co-workers is not enough to establish impermissible bias. *See Allen v. Parke*, 114 Fed.

Appx. 747, 752 (7th Cir. 2004) ("Merely working, or even being friends with the victim is mere tangential involvement, which does not require disqualification of the decision-maker, . . . otherwise an outside hearing body would need to be brought in every time an inmate was charged with a crime against a prison official.") (citation omitted). That leaves Plaintiff's testimony about his argument with Butler at the hearing and Butler's escalating response.

To reiterate, adjudicators are entitled to a presumption of honesty and integrity, and the constitutional standard for impermissible bias is high. To overcome the presumption, Plaintiff must set forth clear, specific, and substantial evidence of actual or potential bias. The Court is also mindful that "[g]uards and inmates co-exist in direct and intimate contact. Tension between them is unremitting. Frustration, resentment, and despair are commonplace. . . ." *Id.* at 562. And "[i]t is against this background that disciplinary proceedings must be structured by prison authorities; and it is against this background that [the court] must make our constitutional judgments." *Id.* Not every hostile or even unprofessional comment from a decision-making officer to a detainee can be viewed as poisoning that officer's impartiality and ability to "judg[e] a particular controversy fairly on the basis of its own circumstances." *Withrow*, 421 U.S. at 55.

Under the circumstances here, Officer Butler's purported comments and conduct during the hearing are not enough to amount to clear and substantial evidence of disqualifying personal bias. Rather, his comments and conduct appear to the Court to reflect his frustration with an argumentative and unrelenting detainee and his resort to a show of power in an effort to bring the detainee back into line. *See Lavoie*, 475 U.S. at 820–

21 (holding state supreme court justice's general hostility and frustration toward insurance companies based on his own personal experiences did not reveal bias that disqualified him from adjudicating a case against an insurance company); *Zimmerman v. Hanks*, 248 F.3d 1162, at *4 (7th Cir. 2000) (unpublished) (officers' antagonistic comments to prisoner during disciplinary hearing did not establish impermissible bias); *Davis v. Reagle*, No. 12-CV-2765-JPH-DLP, 2022 WL 16553157, at *5 (S.D. Ind. Oct. 31, 2022) (officer's statement that she would be "judge, jury, and prosecutor" might be "ill-advised and inappropriate" but "a single off-hand comment is not clear evidence of dishonesty or a lack of integrity."); *Hess*, 149 F. Supp. 3d at 1042, *aff'd* 839 F.3d 668 (7th Cir. 2016) (rejecting plaintiff's argument that adjudicator was likely bias against him because of some offensive remarks plaintiff and his mother had previously made to the adjudicator); *Williams v. Superintendent New Castle Corr. Facility*, No. 16-CV-1344-WTL-MJD, 2017 WL 679989, at *2 (S.D. Ind. Feb. 21, 2017) ("Simply because the hearing officer allegedly became angry when [plaintiff] accused a correctional officer of being racist does not make the hearing officer impartial in the manner contemplated by *Wolff* or *Piggie*."); *Hoskins v. McBride*, 13 Fed. Appx. 365, 369 (7th Cir. 2001) (rejecting plaintiff's argument that hearing officer was biased against him where officer "made various comments to taunt and ridicule [plaintiff] and to openly express his contempt for [plaintiff] and other prisoners in his housing unit" because "[s]uch general 'hostile feelings' are inadequate to demonstrate an unconstitutional bias.") (citing *Lavoie*, 475 U.S. at 821).

### 2. Witnesses and Evidence

Plaintiff contends that if he had been allowed to make a statement at the hearing

he would have said that he was trying to comply with Lt. Wharton's direct order to sit down and that he only kicked her in self-defense (Doc. 75, p. 11). The Court is unconvinced, however, that Plaintiff's statement would have changed the outcome of the hearing. To begin with, there is "[no] constitutional right to raise self-defense as a defense in the context of prison disciplinary proceedings." *Jones v. Cross*, 637 F.3d 841, 848 (7th Cir. 2011); *Scruggs,* 485 F.3d at 938–39; *Rowe v. DeBruyn*, 17 F.3d 1047, 1049 (7th Cir. 1994). Even if such a substantive right existed, "prison regulations could impinge upon that right if they were 'reasonably related to legitimate penological interests.'" *Scruggs*, 485 F.3d at 939 (quoting *Rowe*, 17 F.3d at 1051). And allowing inmates to fight back against an officer would quite obviously "undermine prison discipline . . . [and] subvert[t] a core prison function of ensuring order and safety within the institution." *Scruggs*, 485 F.3d at 939 (quoting *Rowe*, 17 F.3d at 1050). As such, the Committee was not required to allow Plaintiff to argue self-defense or to accept any assertion of self-defense. Furthermore, the regulation at issue does not incorporate intent to do harm as an element of the offense nor make any mention of a prisoner's right to self-defense. ILL. ADMIN. CODE, tit. 20, part 504, Appx. A (definition of 102a. Assault with Injury). The Committee was thus permitted to find Plaintiff guilty of assaulting Lt. Wharton regardless of his motivation in kicking her. Therefore, Plaintiff has not shown that his inability to give a statement at the hearing denied him due process.

### 3. Sufficiency of the Evidence

Plaintiff argues that the guilty finding on the 102a charge for Assault with Injury was not supported by some evidence because the facts in the disciplinary report did not,

on their face, indicate that Lt. Wharton suffered any injury (Doc. 75, p. 12). The Court disagrees.

While the Illinois regulations on discipline in correctional facilities do not define "injury," *see* ILL. ADMIN. CODE, tit. 20, part 504, they do provide for a range of charges for "assault," which sheds some light on the situation. ILL. ADMIN. CODE, tit. 20, part 504, Appx. A. There is Assault (102b) for "contact with a staff member . . . in an offensive or provocative manner." *Id.* There is Assault with Injury (102a) for "contact with, and *resulting in injury* to, a staff member." *Id.* (emphasis added). And there is Violent Assault (100) for "contact with another in a deadly manner or in a manner that results in serious bodily injury." *Id*. Court cases have discussed a similar situation in the criminal context between battery for insulting or provoking contact versus battery with bodily harm. "Although it may be difficult to pinpoint exactly what constitutes bodily harm for the purposes of the [battery] statute, *some sort of physical pain* or damage to the body, like lacerations, bruises or abrasions, whether temporary or permanent, is required." *People v. Moffett*, 148 N.E.3d 736, 748 (Ill. App. Ct. 2019) (quoting *People v. Mays*, 437 N.E.2d 633, 635–36 (Ill. App. Ct. 1982)). "Otherwise there would be no need for the other type of battery[:] contact of an insulting or provoking nature." *Moffett*, 148 N.E.3d at 748 (quoting *Mays*, 437 N.E.2d at 636). This explanation makes equal sense here. And there is some evidence that Plaintiff at least caused Lt. Wharton pain.

Plaintiff kicked Lt. Wharton when the two were in close proximity. By Plaintiff's own admission, this was not a petty kick—he testified "I kicked . . . a real kick. I mean, I didn't just flail on my leg. It had to be a real kick. [Because] my experience in life in dealing

with bullies and violent assholes in authority . . . You can't half-ass things." (Doc. 67-3, p. 85). Common sense says that a kick is more than a simple offensive or provocative touch; a kick by its very nature causes, pain, if not something more. *See People v. Claudio*, 300 N.E.2d 791, 793 (Ill. App. Ct. 1973) ("It seems self-evident that the kicking of the police officers is in and of itself the causing of bodily harm and, therefore, the charge of battery against the defendant was proved beyond a reasonable doubt."). *See also People v. Rotuno*, 510 N.E.2d 463, 465 (Ill. App. Ct. 1987) (sustaining conviction of battery based upon bodily harm even without direct evidence of actual injury because common knowledge dictates officer suffered bodily harm where defendant kicked him in the legs and mid-section).

Sgt. Harris's description in the disciplinary report that Plaintiff kicked Lt. Wharton in the stomach and groin area, combined with common sense, constitutes some evidence sufficient to support the charge of Assault with Injury, even if that injury was relatively minor.

In conclusion, Plaintiff has failed to marshal evidence and argument sufficient to establish a genuine issue of material fact that his due process rights were violated with regard to the March 2019 disciplinary ticket and hearing. As such, Defendants Harris, Butler, Hermetz, and Sullivan are entitled to summary judgment as to Count 4.

### E. COUNT 5 – EXCESSIVE FORCE

In Count 5, Plaintiff alleges that Officer Kimberly Wharton used excessive force on March 2, 2019, when she shoved Plaintiff in his cell (Doc. 7; Doc. 1). To succeed on an excessive force claim, Plaintiff must show that Defendant Wharton's use of force was

purposeful or knowing (as opposed to negligent) and was objectively unreasonable. *Kemp v. Fulton Cnty.*, 27 F.4th 491, 496 (quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 396–97 (2015)). Force is unreasonable when it is not "rationally related to a legitimate nonpunitive governmental purpose," or is "excessive in relation to that purpose." *Kingsley*, 576 U.S. at 398 (citation omitted). In evaluating objective reasonableness, the court must consider the totality of the "facts and circumstances of each particular case." *Kingsley*, 576 U.S. at 397 (citation omitted). The determination must be made "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Id.* And the court "must also account for the 'legitimate interests that stem from the government's need to manage the facility in which the individual is detained,'" and show appropriate deference to "'policies and practices that in the judgment' of [facility] officials 'are needed to preserve internal order and discipline and to maintain institutional security.'" *Kingsley*, 576 U.S. at 397 (quoting *Bell v. Wolfish*, 441 U.S. 520, 540 (1979)).

The Supreme Court provided an illustrative (but non-exhaustive) list of six considerations potentially relevant in evaluating the reasonableness of the force used, including: the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force used; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting. *Kingsley*, 576 U.S. at 397 (citation omitted).

Defendant Wharton concedes that she shoved Plaintiff but contends that the force

she used was *de minimis* (Doc. 67, pp. 17–18). She argues in the alternative that even if the force was more than *de minimis*, it was still used in a good-faith effort to maintain and restore discipline and not maliciously and sadistically to cause harm (*Id.* at pp. 18–20).

The Court agrees with Defendant Wharton that she is entitled to summary judgment. It is important to note that in the Fourteenth Amendment context, "[t]here is, of course, a *de minimis* level of imposition with which the Constitution is not concerned." *Bell*, 441 U.S. at 539 n.21. *See also Graham v. Connor*, 490 U.S. 386, 396 (1989) (applying the Fourth Amendment's objective reasonableness standard and noting that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the [Constitution].") (quotations and citation omitted). According to Plaintiff's own account of the situation, Lt. Wharton shoved him with open hands, three or four times in his chest, eventually backing him into the side of the bed frame. The shoves were not so hard that he lost his balance and fell over; they were not even hard enough to make him stumble (*see* Doc. 67-3). Plaintiff admitted that suffered no actual injury. He did not have any bruising. He did not seek medical attention. And he did not even claim that he was in any pain (*see* Doc. 67-3).

Plaintiff also conceded that Lt. Wharton overheard him being confrontational with Officer Berkeley and deliberately defying his orders to cuff up. While Plaintiff then agreed to cuff up for Lt. Wharton, he admits that he remained confrontational, arguing about the necessity of the medline procedures and making antagonistic comments about Lt. Wharton's attitude and demeanor. Lt. Wharton slammed the cell door shut and turned to walk away but realized the door had not latched. When she turned back toward the

cell, Plaintiff admits he was not at the back of the cell. As Defendants note, at that point, Plaintiff had already made a scene with Officer Berkeley, complained about being restrained, argued about the policy, and made disdainful comments to Lt. Wharton about her attitude. And, now, the door did not latch properly and Plaintiff was not at the back of his cell. Lt. Wharton would have been reasonably justified in thinking that Plaintiff was at the very least being non-compliant, and perhaps that he was advancing toward the open door and presented a threat. While the threat Plaintiff posed was arguably limited considering that he was handcuffed and there were two officers present, the amount of force used was also limited. And it was not gratuitous or unprovoked, nor was it prolonged. Rather the use of force was purposeful—to make Plaintiff sit down on the bed—and limited to the accomplishment of its purpose.

"This is not to say that, in hindsight, [Lt. Wharton] exhibited the utmost patience . . . [or] the finest judgment," but "[a]t some point, in response to defiance and belligerence, officers are entitled to 'preserve internal order and discipline.'" *Hanson v. Madison Cnty. Det. Ctr.*, 736 Fed. Appx. 521, 532 (6th Cir. 2018) (quoting *Bell*, 441 U.S. at 547). Under the circumstances here, no reasonable jury could conclude that Lt. Wharton's shoves were anything more than a *de minimis* use of force or objectively unreasonable. *See, e.g. Jones v. Walker*, 358 Fed. Appx. 708, 713 (7th Cir. 2009) (use of force was de minimis where officer shoved inmate once, bruising his arm); *DeWalt v. Carter*, 224 F.3d 607, 611 (7th Cir. 2000), (use of force was de minimis where officer shoved inmate toward doorway and into door frame, bruising his back), *abrogated on other grounds by Savory v. Cannon*, 947 F.3d 409 (7th Cir. 2020); *Williams v. Dart*, No. 18 C 506, 2018 WL 11239692, at *2 (N.D. Ill. May 10, 2018)

(no excessive force where officer entered cell after inmate was unresponsive to commands and shook him awake, shoving him into the wall in the process); *Mitchell v. Richter*, No. 15-CV-1520-JPS, 2017 WL 752162, at *9 (E.D. Wis. Feb. 27, 2017) (no excessive force where officer pushed a pretrial detainee, who was resisting going into a cell and had a long history of insubordination, even though inmate stumbled forward). Lt. Wharton is thus entitled to summary judgment on Count 5.

**F.   COUNT 6 – FAILURE TO INTERVENE/PROTECT**

In Count 6, Plaintiff alleges that Sergeant Michael Harris failed to intervene and protect him from Lt. Wharton's use of excessive force. Because the Court has already found that Lt. Wharton use of force was not excessive, Plaintiff's related failure to protect claim against Sergeant Harris must likewise fail. Plaintiff cannot show, at the very least, that he faced a "substantial risk of suffering serious harm" or that Sgt. Harris's inaction caused him any injury. *Thomas v. Dart*, 39 F.4th 835, 841 (7th Cir. 2022) (citing *Kemp v. Fulton Cnty.*, 27 F.4th 491, 496 (7th Cir. 2022) (outlining elements of a pretrial detainee's failure to protect claim post-*Kingsley*). Sgt. Harris is thus entitled to summary judgment on Count 6.

## CONCLUSION

The motion for summary judgment (Doc. 67) is **GRANTED IN PART and DENIED IN PART**. It is **GRANTED** as to Defendant Holt on Count 1 and Count 2; Defendants Harris, Butler, Hermetz, and Sullivan as to Count 4; Defendant Wharton as to Count 5; and Defendant Harris as to Count 6. As such, Counts 1, 2, 4, 5, and 6, are **DISMISSED with prejudice** along with Defendants Harris, Hermetz, and Wharton.

The motion is **DENIED** as to Defendants Holt, Butler, Tasky, and Sullivan as to Count 3. This matter will proceed to trial on Count 3, regarding whether Defendants Holt, Butler, Tasky, and Sullivan violated Plaintiff's right to due process by charging him with, finding him guilty of, and punishing him for the 215 charge of Disobeying a Direct Order Essential to Safety and Security without sufficient evidence to support all elements of that charge.

A status conference to discuss the trial schedule and the utility of a settlement conference will be set by a separate Order.


**IT IS SO ORDERED.**

**DATED: March 27, 2024**

<u>s/ Mark A. Beatty</u>
**MARK A. BEATTY**
**United States Magistrate Judge**